431 So.2d 786 (1983)
Mrs. Isnell HARVEY, et al.
v.
Walter Ernest HARVEY, Jr.
No. 82 CA 0664.
Court of Appeal of Louisiana, First Circuit.
April 5, 1983.
*787 Richard Kilbourne, Clinton, for plaintiffs-appellees.
Leslie D. Ligon, Jr., Clinton, for defendant-appellant.
Before COVINGTON, LANIER and ALFORD, JJ.
*788 COVINGTON, Judge.
This is an appeal by defendant, Walter Ernest Harvey, Jr., from a judgment of the district court recognizing that plaintiffs, Isnell Harvey, wife of and Curtis A. Harvey, are in possession of the property hereinafter described and restoring them to possession of that portion of the subject lands from which they were evicted by the defendant, said portion containing 7.32 acres. The reconventional demand of the defendant for damages for trespass and harassment was denied, and the defendant was ordered to assert his claim of ownership to the 7.32 acres portion within 60 days from the date the judgment becomes executory. We affirm.
After a thorough review and evaluation of the record, we are convinced that the evidence supports the facts found and the reasons assigned by the trial court. We find that the written reasons of the trial judge, a copy of which is attached, correctly dispose of the factual and legal issues presented by this case.
The subject property is described as follows:
1. Twenty-nine acres, more or less, bounded, now or formerly, as follows: north by heirs of Nee Harvey; east by lands of Walter Ernest Harvey and of Mrs. Lucy Davis Harvey; south by M.L. Harvey and west by lands of Mrs. Isnell Harvey.
2. 72.20 acres bounded north by, now or formerly, Walter Ernest Harvey and Mrs. Isnell Harvey; east by the public road and land of Leslie D. Bickham and on the west by Fletcher Harvey.
Plaintiffs are further restored to possession of the property described as 7.32 acres according to the survey plat filed with the record.
For the reasons expressed by the trial judge, which we adopt as our own, the judgment appealed is affirmed, at the cost of appellant.
 AFFIRMED.
ISNELL HARVEY and * NUMBER: 7545 DIVISION A
CURTIS A. HARVEY
 * 20TH JUDICIAL DISTRICT COURT
VERSUS
 * PARISH OF WEST FELICIANA
WALTER ERNEST HARVEY, JR.
 * STATE OF LOUISIANA

REASONS FOR JUDGMENT
This is a possessory action instituted by Isnell Harvey and Curtis A. Harvey, the plaintiffs, on October 15, 1980 against Walter Ernest Harvey, Jr., the defendant, seeking to have recognized the plaintiffs' right to possession over two tracts of land and asking for an order requiring the defendant to assert his claim of ownership in a petitory action within sixty (60) days after the judgment becomes executory.
The petition describes the tracts in dispute in West Feliciana Parish, Louisiana, as follows:
(1) Twenty-nine acres, more or less, bounded, now or formerly, as follows: north by the heirs of Nee Harvey; east by lands of Walter Ernest Harvey and of Mrs. Lucy Davis Harvey; south by M.L. Harvey and west by lands of Mrs. Isnell Harvey.
(2) 72.20 acres bounded north by, now or formerly, Walter Ernest Harvey and Mrs. Isnell Harvey; east by the public road and land of Leslie D. Bickham and on the west by Fletcher Harvey.
The defendant answered, denying the claims of the plaintiffs as to their possession, and reconvened seeking $50,000.00 in damages for alleged trees cut over the property lines and fences destroyed by the defendants in reconvention, and also for the *789 harassment and slander the defendants in reconvention have caused the plaintiff in reconvention.
On March 26, 1981 an answer in the form of a general denial was filed by the defendants in reconvention also seeking damages.
The plaintiff in the main demand, Mrs. Isnell Harvey, et vir., is the aunt of the defendant, Walter Ernest Harvey, Jr. The property which is the subject of this action was originally a portion of the F.F. Harvey, Sr. estate which was partitioned and divided among his heirs in about 1942, to wit:
Isnell Harvey, fifty (50) acres; Ernest Harvey, forty (40) acres; Fletcher Harvey, fifty (50) acres; and M.L. Harvey, seventy-two (72) acres
Walter Ernest Harvey, Sr. who was a half brother transferred his forty (40) acres to W.S. McKowen in payment of a debt.
W.S. McKowen then transferred in the 1940's twenty-nine (29) acres of the above forty (40) acres to Isnell Harvey, plaintiff herein and transferred the remaining eleven (11) acres to Mrs. Lucy Harvey, wife of Ernest Harvey, Sr., and the mother of defendant. These eleven (11) acres together with a one (1) acre tract previously school land made the Ernest Harvey, Sr. and Lucy Harvey interest a total of twelve (12) acres in West Feliciana Parish, Louisiana.
Ernest Harvey, Sr. died on June 18, 1974 and through inheritance and acquisition Ernest Harvey, Jr. is the sole and proper defendant.
When Ernest Harvey, Jr. constructed a new barbed wire and hog wire fence enclosing 19.92 acres, the plaintiffs filed this possessory action. The area in dispute is 7.32 acres.
It is regretful that this action between neighbors and relatives reached the emotional intensity and variance of recollections which were manifest in this hearing.
Both claim corporeal possession since the early 1940's. Plaintiffs maintain that the twelve (12) acres occupied by defendant's family was laid out on the ground by family members with tape pulled by Fletcher Harvey and the south line made parallel to the north line called the Cotton Place. The frontage attributed to Ernest Harvey, Sr. was determined by percentage and agreed upon by the parties. Disputes as to the frontage, if any, are inconsequential in this action.
Mr. W.C. Snyder, C.E. surveyed the lines in contention as shown as P-1 of the exhibits. The exhibit is marked A-B-C for the recently constructed fence which encloses the 19.92 acres and marked X-Y-Z for the lines enclosing 12.60 acres. Points A and X on the public highway 966 are approximately the same.
The defendant in the main demand, Mr. Ernest Harvey, Jr., testified that the fence he built in 1980 (A-B-C) was a fence rebuilt on the existing boundaries between the plaintiffs and his father. He related that as a young lad he built the original fence and he consistently maintained that the recently constructed fence is at the same location of the original. He was born in 1931; the original fence was built in the early 1940's. The defendant related that their family was extremely poor, that he had to drop out of school for a time in his elementary grade years to help raise food and to hunt and fish for the family and he is thoroughly familiar with the property in dispute. The history as related by him is that his father's brothers and sisters determined the corners on the road for his father's property and that his uncle Emmett told them where the corners would be located, and the fence was built accordingly. He explains that he is concerned not about acreage but about possession within the old fences. He described the hills, called Mardi Gras Hill, the bottoms, the gully or bayou area and how he gardened and hunted and fished in the area and described several fences called field fences and others to keep the family goat herd. All of the area is not subject to cultivation. The goats couldn't even keep up with the briars and undergrowth. He related an emotional attachment to the land, it being the only home he knew as a child and now has returned to reside thereon. Mr. Harvey, defendant, did not cause the property to be surveyed when *790 he built the 1980 fence which cost over $5,000.00, explaining that he felt no need to survey. Nor did he consult with the plaintiff prior to construction.
The defendant called Mr. Marlin Coston, a mechanic, carpenter, fence builder and general repairman, to relate details about his building the 1980 fence. Mr. Coston was the general supervisor on the job assisted by general laborers. He testified that he found evidence of rotten posts in spots and one or two still standing. He found an old cedar post at point B near the plaintiffs pond which he interpreted perhaps to be an old gate, and found a big pine on point C with wire. He built the fence beginning at point A on the highway and measured from fence to a point on the South, evidently and according to his testimony, to build the fence parallel to a section line. The points from B to C was "built by ear" because between BC only a little wire was found within fifteen (15) to twenty (20) feet of point C. He recalled that Ernest Harvey defendant, did not walk line B-C with him. It was grown up and they cut through.
Bertrand Morrison was a general laborer with Marlin Coston and Robert Gilmore. He related that they found old wire near point A on the road and rotted posts under leaves and four or five good posts. He believed the old fence was where the new one was constructed, but he was inconsistent as to whether the old wire was south or north of the new fence. He recalled a cedar post with wire near point B, but found no posts from B to C, but recalled wire in the pine tree at point C.
The defendant called Henry Smith, a 68 year old share-cropper who related he had grown cotton and potatoes on Mardi Gras Hill, but although he was confused at first about the dates, it was his final testimony that he farmed it in 1937-38 which was before construction of the fences in this lawsuit. He did recall helping Fletcher Harvey, uncle to defendant, build a catch pen which corroborated other testimony that wire was used for a catch pen at point A.
Mrs. Lucy Harvey, widow of Ernest Harvey, Sr. and mother of Ernest Harvey, Jr., defendant, recited that the family grew watermelons, gardens and corn behind the home in the bottoms and the children hunted in the area. The family ran goats and animals and had fences "all over the place" and felt sure that their goats grazed on Mardi Gras Hill because they couldn't even keep them off the highway. Mrs. Harvey was a kind and pleasant witness genuinely concerned, but admitted that she gets turned around in the woods and didn't go back there much. She was disturbed about timber cutting (1973-74) done by plaintiffs and stated that she refused their offer to pay for some trees. It must be noted that plaintiffs admit cutting two trees on the twelve (12) acre homesite when timber was harvested from the Isnell Harvey tract including the 7.32 acres disputed. Mrs. Lucy Harvey recalled that there was a dispute over the years between her husband and the others, and Ernest, her husband disagreed with the boundary. She testified that no one has possessed disputed area "except us". We've had the use. In response to the discrepancy between 12 and 20 acres, she replied that her husband only claimed what they (Fletcher, Ernest and Brothers) measured off.
Defendant called James Jenkins, Jr., a civil engineer, surveyor, pilot, business associate and fishing companion with the defendant. He testified he had been on the property 6 to 8 times from 1963-78. He specifically recalled having to crawl through a fence to get to plaintiffs pond. He described the terrain from defendants home to plaintiffs pond as steep hills, heavily wooded, and with undergrowth. His recollection of crawling through a fence that was overgrown with briars and bushes and located the rear pond on B-C line of the new fence. He didn't recall a fence at X-Z line nor did he recall seeing or recognizing kudzu in the area. It is understood that he recalled a large corner post about point B, but didn't recall a big cedar post.
William Fletcher Harvey, security guard at D.C.I. and brother to defendant, Ernest Harvey, testified he lived on the property *791 all of his early life and related that his family possessed the property in dispute. He stated that at 8 or 9 years of age his brother (defendant) and he built the fence A-B-C and that Mr. Joe Vinci paid for the fence if the family would raise goats and give him the milk. He recalled that the fence fell in disrepair in the late 1970's and the neighbors cows (Bickham) came through at will. After plaintiffs' timber operation the fence had to be rebuilt. He was emphatic that within the year September, 1979 to October, 1980 the plaintiffs had not possessed and that after their timber operation the fence was repaired. He clarified that Mardi Gras Hill is more extensive than the disputed area, and reiterated that their family farmed three or four acres of it. Mr. Harvey unequivocably denied that there had ever been a fence at X-Y-Z. He acknowledged that plaintiffs built a big pond in 1952-53 and the old fence at A-B-C was there when plaintiffs pond was built. He denied that plaintiffs planted kudzu in the disputed area, explaining that it got there on its own. He did acknowledge that if wire was removed from areas of X-Y-Z it could have been pieces of fences because they fenced bottoms and smaller areas, but that the A-B-C line was never abandoned.
The plaintiffs in cross examination of the defendant elicited information that (1) the eleven (11) acre description reconveyed by W.S. McKowen to Mrs. Lucy Harvey did not state more or less and (2) that the relatives had placed a pipe at points A and X which defendant doesn't recall, and (3) that the dimensions he recalled his father relating to him were markedly inconsistent with the survey of the 1980 (A-B-C) fence, and (4) that his complaint about plaintiffs cutting timber in the disputed area was only to M.L. Harvey and never to his aunt, the plaintiff or to Netterville, the logging contractor. The defendant lived in Baton Rouge in 1974 when the timber was cut. The defendant in explanation of the wire in the X-Y-Z area stated that there was wire removed from the area but it had been there only for the purpose of enclosing bottom fields and had nothing to do with the boundary. He did acknowledge there was wire "grown" into the trees which he removed and trimmed to "clean up the place."
W.C. Snyder, surveyor, real estate broker and forester, was called by plaintiff to testify relative to his survey of the subject property (Exhibit P-1). His findings were that on the X-Y-Z line that the wire was freshly cut and removed from the trees. He found no evidence of an old fence on the A-B-C line. His review of aerial photographs indicated to him evidence of a fence on the X to Y line and none on the A-B-C line. He did recall seeing wire on the large pine tree at point C on the Cotton Place boundary. His survey reflects that his location of the old boundary line (X-Y-Z) was based on wire in trees and fence posts as shown (P-1). The survey reflects that the old fence line enclosed 12.60 acres. The A-B-C line adds 7.32 acres, thus the 1980 fence encloses 19.92 acres. Mr. Snyder also plotted in the stumps he found attributable to the plaintiff's sale of timber in 1973-74. He related upon examination of a series of aerial photographs (1952-78) that there was visual evidence of a fence line X-Y-Z but not A-B-C. When asked if an effort to clean up property would remove evidence of a fence, he replied that it would take a bulldozer to remove the evidence because a 40 year old fence will be seen by trees growing up on it.
Mr. Fletcher Harvey, brother of the plaintiff and thus uncle to the defendant, confirmed the division of the F.F. Harvey, Sr. Estate in 1942, the transfer by Ernest Harvey, Sr. to W.S. McKowen, and the subsequent transfer by W.S. McKowen of 11 acres to Mrs. Lucy Harvey. He stated that he laid off the 11 acres, that the family attributed 60% of the road front to Ernest Harvey, Sr.; and that Nell (plaintiff), Ernest and he (Fletcher) measured and figured running the lines parallel to the north boundary and measured back to make the correct acreage. He recalled that the fence was put on the line that was measured and stayed there a good many years. He denies the new fence A-B-C is located where the old one was. He had evidently run cows on *792 the F.F. Harvey, Sr. estate prior to its partition. He didn't recall a cedar corner post.
Mr. M.L. "Bo" Harvey related that he arranged the timber sale for his sister Isnell (plaintiff) and showed the contractor the fence lines. He denies there was an old fence where the new A-B-C fence is located. Timber was cut in the disputed area and two trees beyond that he acknowledged were on the defendant's property. His recollection about talking to Ernest Harvey, Sr. about the trees appears to be inconsistent with the dates of cutting and the date of Ernest Harvey's death.
Mr. Edward Netterville who cut the timber recalls the complaint about two trees, but his testimony relates mostly to his discussions with M.L. Harvey. He has cut trees for M.L. Harvey for 15 years. His testimony about Mr. M.L. Harvey showing him the lines is not as descriptive as Mr. Harvey's recollection.
Mrs. Isnell Harvey, plaintiff, now 76 years of age, discovered the new fence constructed by defendant by noticing a new gap and partial gravel road south of the new fence line. She recited an old contention about Ernest moving the frontage fence to build a church, but the church was not built. She discussed measuring off his land, and recited the history of the transactions and recalled that she and her husband, Curtis, now very ill, paid for the 29 acres from W.S. McKowen by blood and seat. She is a retired school teacher. Mrs. Isnell Harvey recalled measuring the Ernest Harvey lines with chain, and the children with Ernest built the fence in about 1942-43.
She specifically denied that an old fence had been at the location of the A-B-C 1980 fence. She related that she and her husband have sold timber, granted mineral leases, constructed ponds, grazed cattle, planted kudzu and paid taxes. She specifically recalled in the 1950's her husband let her ride on the tractor in their vetch patch on Mardi Gras Hill. She expressed hurt and sorrow that the family is in dispute, but most concerned and disappointed that 7-8 acres of "her" land was fenced. She related that the controversy over the timber cutting involved only two trees cut out of the disputed area.
Mr. Ben Harvey son of the plaintiff with the Federal Aviation Administration, a pilot and graduate of L.S.U. Law School with military experience and now in Waco, Texas reviewed aerial photographs and identified the properties. He recalled that his mother and father built two ponds about 1950-51 on the property acquired by his mother, that he plowed south and east of the big pond which big pond is adjacent to the 1980 A-B-C fence constructed by defendant. Although in the service and residences at Newellton and Baton Rouge, he returned to his mothers place at intervals but last lived there in 1950-51. He related that they plowed to the old fence, and there was no fence on the A-B-C line, no line of old trees, and no evidence of an old line being there; and he didn't see any fence near the pond when he fished it in the 1960's. He visited frequently until 1955, was in the service 1955-59, and returned 3 or 4 times in the 1960's and has been on the property 5 or 6 times in the last 1-1½ years. In discussions with his cousin, the defendant, Mr. Ben Harvey told him that the fence should not have been constructed without a survey, that he was reluctant to say the fence was wrong because he and defendant grew up as brothers. He admitted that he told the defendant that he couldn't remember, but had to refresh his memory, and he frankly stated that "I can't say that they have not possessed." He specifically related, however, that his dad, Mr. Curtis Harvey, husband of plaintiff, had planted pines and kudzu in the disputed area. He believed that he was on the property more than his cousin Ernest, defendant, in the 1940's, and recalls numerous fences on the Ernest Harvey property but within the X-Y-Z fence line; and that over the years there were fences outside put up by Fletcher Harvey, their uncle.
The plaintiffs also called Mr. Eric Jeansonne, an expert photogrammatrist, who reviewed the series of aerial photographs 1952-78, concluding that there was little *793 evidence of A-B-C fence line from the aerial photographs, but acknowledged through skillful cross examination that there were indications of different type vegetation in areas along the B-C line. There was more evidence of a fence line at X-Y-Z than A-B-C.
Mr. Fletcher Harvey, the last witness in rebuttal, contradicted defendant's recollection that Emmett had measured the Ernest Harvey property but that (1) Emmett did the figuring and that (2) Fletcher himself measured and ran the line parallel to the Cotton Place to the north which was an old established line and that (3) the back line was about the same as the frontage, and that (4) the fence was built on that line. He reiterated that the 1980 fence was not in the same location.
Some of the contentions have been recited briefly to indicate the wide and apparently irreconcilable differences which confront the trier of fact.
Whenever possible, inconsistencies are results of and attributable to the frailty of human memory. These conceptions often grow into patterns of belief. Nevertheless, they must be resolved by this Court by fact finding and application of legal principles.
The plaintiff and defendant cannot both be correct on the location of the boundary fence between the estates and the fact of existence of a fence at X-Y-Z and A-B-C (exhibit P-1). The testimony (and physical evidence) of those disinterested parties should be considered.
For the following reasons this Court finds that plaintiffs by a preponderance of the evidence enjoyed corporeal possession following by civil possession of the disputed area after construction of a 1942-43 fence on X-Y-Z. Mr. W.C. Snyder, a disinterested witness, found evidence of the X-Y-Z fence and plotted its location from physical remnants. It is approximately parallel to the north line and the rear and frontage lines are consistent with the testimony of Mr. Fletcher Harvey who was present and participated in the 1942-43 measurement and the laying out of the boundary. The aerial photographs 1952-78 although not absolute are consistent with this determination. The A-B-C lines do not enjoy this correlation.
Additionally, there were many fences on the F.F. Harvey Estate and remnants of many fences. There was wire and there were rotted posts in other areas especially along the A-B line and gap at point B and C, and the interior garden and field fences. It is accepted that Ernest Harvey used some of the land, grazed goats, hunted, cut wood and gardened near their homesite and outside the X-Y-Z fence. It is accepted that Mrs. Isnell Harvey built ponds, plowed, planted crops, cut timber, leased for oil, paid taxes, bushhogged briars on the land acquired from the F.F. Harvey Estate and the 29 acres acquired from W.S. McKowen, and thus legally possessed to the extent of its bounds.
The possessory action in Louisiana is governed by Article 3658 of the Code of Civil Procedure:
To maintain the possessory action, the possessor must allege and prove that:
(1) He had possession of the immovable property or real right therein at the time the disturbance occurred;
(2) He and his ancestors in title had such possession quietly and without interruption for more than a year immediately prior to the disturbance, unless evicted by force or fraud;
(3) The disturbance was one in fact or in law; and defined in Article 3659; and within a year of the disturbance.
The elements and characteristics of the possession necessary to maintain a possessory action vary with the nature of the property and other attending relevant circumstances. Thus, the acts which must be shown to establish possession are governed to a large extent by the use to which the land is destined or for which it is suitable. Also, it is well established law that physical occupancy of any part of a tract specifically described in a deed with the intent to possess the whole will constitute possession of all of the property included therein. LSA-C.C. Art. 3437 and LSA-C.C.P. Art. 3661; *794 Hill v. Richey, 221 La. 402, 59 So.2d 434 (La.1952).
The evidence shows that the land involved in this suit is overgrown agricultural land and wooded areas. In applying the above principles as to possession, this Court finds that the evidence introduced by the plaintiffs is sufficient to constitute their corporeal possession in the early 1940's followed by corporeal and civil possession of the above described tracts. The testimony specifically revealed that over the years the plaintiffs have farmed the tracts, constructed ponds and levies on the tracts, entered into timber contracts for lumber on the tracts and entered into mineral leases involving the two tracts including the disputed area and paid taxes thereon.
Once possession is acquired, possession is preserved by the intention of possessing, although the possessor may have ceased to have the thing in actual custody. Continuity of Possession, Art. 3658 of the Code of Civil Procedure does not require, expressly, that the possession be continuous. However, according to the Civil Code, discontinuity is a vice of possession that excludes possessory protection. C.C. Art. 3487. Possession is continuous when exercised in regular intervals. See 3 Planiol et Ripert, Traite Pratique de Droit Civil Francais 171 (2nd ed. Picard 1952). For possessory protection, the law does not require corporeal possession for an entire year. Constructive possession or civil possession suffices LSA-C.C.P. 3660; Parkway Dev. Corp. v. City of Shreveport, 342 So.2d 151 (La.1977).
However, a possessor may lose possession if he is forcibly ejected or prevented from returning or allows his property to be usurped for a year without doing any act of possession. Liner v. Louisiana Land and Exploration Company, 319 So.2d 766 (La. 1975). The disturbance to their possession complained of by the plaintiffs is the construction of a fence by the defendant, which disturbance is characterized as a disturbance in fact, defined in LSA-C.C.P. Art. 3659:
A disturbance in fact is an eviction, or any other physical act which prevents the possessor of immovable property or of a real right from enjoying his possession quietly, or which throws any obstacle in the way of that enjoyment.
In reiteration, the preponderance of the evidence in this case for reasons herein above expressed is that the X-Y-Z dividing line was the one marked and established in the early 1940's. As a result of that fact finding, plaintiffs by their acts on the 29 acres including the disputed land enjoyed corporeal and civil possession.
One having acquired the corporeal possession of an immovable does not thereafter lose it against his consent except in the manner prescribed by law. Liner v. Louisiana Land and Exploration Company, supra. A person loses the right to possess immovable property either voluntarily, by transferring or abandoning the property; or involuntarily, by being evicted or expelled for more than a year or by acquiescing in a third party's usurpation of the property for more than a year. LA C.C. Arts. 3447, 3448, 3449. A question often arises as to what type of activity by an adverse party will sufficiently interrupt a person's right to possess so as to usurp his possession and strip him of his right upon passage of more than a year's time. Not every disturbance is strong or long enough to interrupt another's right to possess. Disturbances which do not interrupt another person's right to possess may be challenged in court and the disturber cast for appropriate damages and other appropriate relief. But such minor disturbances will be insufficient even if unchallenged within a year's time, to strip the right to possess from the person who presently has that right.
Louisiana courts have indicated that for a disturbance to be sufficient to interrupt another's right to possess, the disturbance must bring home to the actual possessor the realization that his dominion is being seriously challenged. Pitre v. Tenneco Oil Co., 385 So.2d 840 (La. 1st Cir.1980).
Louisiana courts have found the following acts insufficient to interrupt another's possession: the surveying and marking of *795 boundary lines, S.D. Hunter Foundation v. Board of Commissioners of the Caddo Levee District, 286 So.2d 525 (La.App. 2nd Cir. 1973); sporatic trapping, chicken farming, hunting and leasing a house in the vicinity, Plaisance v. Collins, 365 So.2d 608 (La.App. 1st Cir.1978); granting of trapping, grazing and mineral leases, Pitre v. Tenneco Oil Co., 385 So.2d 840 (La.App. 1st Cir.1980); and occasional hunting, Norton v. Addie, 337 So.2d 432 (La.1976).
Plaintiffs were not evicted, nor lost their possession under the law until the 1980 fence. Their suit was timely filed.
It is therefore the ruling of this Court that judgment should be for the plaintiffs in the main demand and against the defendants and plaintiffs in reconvention. No award for money, damages is sustained. Costs should be paid by defendants including expert witness fees of Mr. W.C. Snyder in the amount of $600.00 and Mr. Eric Jeansonne at $300.00.
Defendant shall be ordered to assert his claim to ownership in a petitory action within sixty (60) days from the date the judgment hereon becomes executory or be precluded thereafter from asserting ownership of said property or portion thereof.
Judgment will be signed accordingly.
JUDGMENT RENDERED this 19 day of May, 1982 at Clinton, Louisiana.
 s/William F. Kline, Jr.
 WILLIAM F. KLINE, JR., JUDGE,
 DIV. A
 20TH JUDICIAL DISTRICT COURT