BAKER PRINTING COMPANY, INC.
v.
KIMBALL PROPERTIES, L.L.C. AND H.M. KIMBALL, JR.
No. 2008 CA 0186.
Court of Appeal of Louisiana, First Circuit.
July 8, 2008.
Not Designated for Publication
H. ALSTON JOHNSON III, THOMAS H. KIGGANS, JONATHAN C. BENDA, MICHELLE F. PLAUCHÉ Counsel for Plaintiff/Appellant Baker Printing Company, Inc.
DAVID M. ELLISON, Jr., Counsel for Defendants/Appellees Kimball Properties, L.L.C. and H.M. Kimball, Jr.
Before: GAIDRY, McDONALD, and McCLENDON, JJ.
McCLENDON, J.
Adjoining landowners, Baker Printing Company, Inc. (Baker Printing) and Kimball Properties, L.L.C. (Kimball Properties), filed competing possessory actions claiming possession of a disputed strip of property situated in between the tracts of property they each indisputably own. The trial court rendered judgment in favor of Kimball Properties and against Baker Printing. For the reasons that follow, we reverse the judgment of the trial court and render judgment in favor of Baker Printing and against Kimball Properties.

FACTUAL AND PROCEDURAL HISTORY
At trial, the following facts were established by Baker Printing. On June 7, 2001, Baker Printing purchased approximately 873 acres that included the purchase, without warranty, of the strip of property at dispute herein, the title to which Baker Printing presented into evidence.[1] After its purchase, Baker Printing began to pay the annual property taxes on the disputed strip. Specifically, this strip consists of several acres of wooded property situated to the north of Baker Printing's undisputed property that is likewise wooded. Conversely, to the north of the disputed strip lies Kimball Properties' undisputed property, which is open farmland primarily planted with soybeans.
Along the northern edge of the disputed strip is a tree line. Consequently, as pointed out by Baker Printing, there is a natural boundary at the northern edge of the disputed strip, the point to which Baker Printing claims possession. However, there is no such boundary at the southern edge, the point to which Kimball Properties claims possession. Also, within that tree line were the vestiges of an old fence, constructed long ago by Kimball Properties, although sizeable portions of it had been destroyed by the time Baker Printing purchased the property. Shortly after its purchase, Baker Printing undertook to repair what remained of the fence and erect additional fencing, so that both a tree line and a fence ran along the northern edge of the disputed tract. Baker Printing also erected two metal gates with locks elsewhere on the disputed strip. One of these gates was located approximately 40 feet from the fence/tree line.
Furthermore, immediately following its purchase of the property, Baker Printing enrolled the entirety of the property it purchased, including the disputed strip, in the Louisiana Department of Wildlife and Fisheries' (LDWF) Deer Management Assistance Program (DMAP or program). Via an affidavit admitted into evidence, the LDWF attested that Baker Printing had complied with all of the program's regulations. These regulations required program participants to clearly mark and post the boundaries of their property with DMAP signs in compliance with LSA-R.S. 56:110. Pursuant to LAC 76:V.111.A.1.e.ii., as it existed in 2001, DMAP signs were required to be placed at 1,000 foot intervals around the entire boundary of the property and at every point of entry. An invoice, introduced into evidence, shows that Baker Printing ordered the appropriate DMAP signs at the end of June 2001, and posted the signs around the perimeter of the property, including the fence/tree line enclosing the disputed strip.
The evidence presented by Baker Printing also shows that in 2001, 2002, and 2003, it harvested deer in accordance with DMAP's regulations. In so doing, Baker Printing erected several deer stands on the disputed strip. At least two of those stands were put up within approximately 15 to 40 feet of the fence/tree line. Moreover, the documentary evidence established that representatives of Baker Printing hunted and made successful kills[2] on the property under DMAP regulations on the following dates in 2001: October 26, 27; November 6, 10, 15, 17, 18, 19, 20, 22, 23, 24, 26, 29, 30, 31; and December 1, 2, 8, 9, 15, 19, 21, 22, 25, 27, 29, 30. In 2002, they hunted and made successful kills on January 1, 5, 8, 12, 19, 20, 26; November 14, 17, 21, 23, 24, 29, 30; and December 6, 15, 21, 27; and in 2003, on January 1, 4, 10, 11, 14, 18, 19, 25.
Baker Printing also introduced into evidence an invoice establishing that it had leased a bulldozer for four days in August 2001 for the purposes of clearing an antiquated road that had existed on the disputed strip but had become overgrown and impassable. Baker Printing used the bulldozer, as well as chain saws, to clear the road of logs, stumps, etc., to make it traversable again. Moreover, in certain areas, Baker Printing adjusted the path of the road to make it straighter. As demonstrated by documentary evidence admitted at trial, this road ran parallel to the fence/tree line, and at least a portion of it was actually located within approximately five to ten feet of the fence/tree line. After clearing this road to make it accessible again, Baker Printing undertook to patrol the perimeter of its property, including the northern edge of the disputed strip, three to four times per week. At no time during these patrols, or while hunting on the property, did representatives of Baker Printing see any unknown persons on the disputed strip.
In 2003, Baker Printing entered into a Piecemeal Timber Sale Contract. Pursuant to this contract, a timber company began cutting timber on the disputed strip in August 2003. At some point during the logging operation, H.M. Kimball, Jr., of Kimball Properties, appeared on the scene claiming ownership of the disputed strip and demanded that the logging operation cease immediately. Thereafter, Baker Printing instituted a possessory action claiming that Kimball Properties had disturbed its possession.
Like Baker Printing, Kimball Properties also filed a possessory action claiming that its possession had been disturbed by the August 2003 logging incident. At trial, Kimball Properties submitted the following facts. H.M. Kimball, Jr. (H.M.) testified on behalf of Kimball Properties that his father[3] purchased the entirety of section 32, which he contends includes the disputed strip; however, no title was introduced into evidence.
H.M. maintained that after his father bought the property, he walked the property line with his father as it was being surveyed. His father arranged to have a bulldozer clear the area near the disputed strip; however, the bulldozer was instructed to clear only to the point of the presently existing tree line to ensure that the bulldozing activities remained on Kimball Properties' side of the property line. He further testified that Kimball Properties erected the fence at the tree line, but that it was not intended to serve as a boundary. Rather, he averred that it was merely intended to keep cattle in the pasture. He stated that approximately 20 years ago, when they ceased all cattle operations, he tore most of this fence down. He affirmed that the representatives of Baker Printing put the fence "back up."
H.M. conceded that at the southern boundary of the disputed strip, the point to which Kimball Properties claims possession, there is no boundary, just woods.[4] He further admitted that the northern boundary, where Baker Printing claims its possession extends, is marked by the fence/tree line.
With regard to alleged acts of corporeal possession on the disputed strip, the testimony established that representatives of Kimball Properties used to drag dead cattle onto the strip through a gap in the fence; however, this had not been done for 20 to 25 years. H.M. also testified to using the old road when he hunted;[5] however, he had ceased hunting several years earlier and had not done any hunting after 2001 when Baker Printing purchased the property.
Significantly, neither H.M. nor any of the other four witnesses who testified on behalf of Kimball Properties testified that they had set foot on the disputed strip from the time that Baker Printing purchased the property until the logging incident that occurred in August 2003. Two of Kimball Properties' witnesses testified that they hunted in the vicinity of the disputed strip; however, they specified that they hunted from deer stands located next to the fence/tree line and on the undisputed property of Kimball Properties. They never stated that they crossed this point and thus entered onto the disputed strip to conduct their hunting activities. Moreover, despite hunting generally in the vicinity, and specifically from the deer stands located immediately on the fence/tree line, none of these witnesses acknowledged seeing the cleared road or any of the deer stands on the disputed strip and within mere feet of the fence/tree line.
Most of the witnesses testifying on behalf of Kimball Properties denied seeing the DMAP signs posted along the fence/tree line. However, H.M. testified that his nephew had not kept the grass cut very well along the edge of Kimball Properties' undisputed tract, which lies immediately north of the disputed strip, and that its height obscured the view of the fence/tree line. H.M. himself was ambivalent about seeing or being aware of the presence of such signs. His relevant testimony on this issue was as follows:
Q: Now, when you went out there, were there any DMAP signs there?
A: I never noticed any. It was grown up a pretty good bit along there. I don't think [my nephew] had mowed between the canal and the fence very well, and I never noticed any along there. If I did, I didn't think much about them. Frank Pierce hunted over there. We gave him permission to hunt.[6] He may have put some up. I didn't know.
Q: When did Frank Pierce hunt there?
A: Up until when [Baker Printing] bought it.
* * *
Q: And, do you know if he put up any DMAP signs or not?
A: I didn't know.
Q: You don't know one way or the other.
A: I never noticed signs. I never really paid no attention. . . . I hadn't been in that area of the place in five, six, seven years.
* * * * *
Q: Now, you saw the DMAP signs before the August 4th, 2003 [logging incident]. Did it alert you that anyone was trying to possess your property?
A: No, sir.
What is certain is that the DMAP signs were posted along the fence/tree line at the time the logging incident occurred, at which time H.M. began tearing them down. Shortly thereafter, Baker Printing replaced the signs destroyed and/or removed by H.M.
With regard to the locked gate approximately 40 feet from the fence/tree line, all of the witnesses for Kimball Properties denied seeing it. Nevertheless, some of those witnesses admitted to seeing something reflective and/or fluorescent in that area, but never went on the disputed strip to investigate what it was. Witnesses for both parties testified that representatives of Kimball Properties would have seen the gate if they had gone onto the disputed strip.
After assessing all of the above facts, the trial court ultimately concluded that Kimball Properties had originally gained possession of the disputed strip and that its possession had never been interrupted by Baker Printing. From this judgment, Baker Printing appealed, asserting the following assignments of error:
(1) The trial court erred in concluding that Kimball Properties proved open, public and peaceful possession of the disputed strip for one year immediately preceding a disturbance of possession; and
(2) The trial court erred in concluding that Baker Printing failed to prove its possession of the disputed strip preceding Kimball Properties' disturbance of its possession. Based upon the foregoing facts and the controlling law, we find merit in Baker Printing's arguments.

STANDARD OF REVIEW
In a possessory action, what constitutes possession is a question of fact. See LSA-C.C. art. 3422. Generally, a court of appeal should not set aside the factual findings of a trial court absent manifest error or unless they are clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La. 1978). Although appellate courts should accord deference to the factfinder, they nonetheless have a constitutional duty to review facts. Ambrose v. New Orleans Police Dept. Ambulance Serv., 93-3099, 93-3110, 93-3112, p. 8 (La. 7/5/94), 639 So.2d 216, 221. Because appellate courts must perform this constitutional function, they have every right to determine whether the trial court verdict was clearly wrong based on the evidence or clearly without evidentiary support. Ambrose, 93-3099, 93-3110, 93-3112 at pp. 8-9, 639 So.2d at 221. The reviewing court must do more than simply review the record for some evidence that supports or controverts the trial court's findings; it must instead review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Stobart v. State through Dept. of Transp. & Development, 617 So.2d 880, 882 (La. 1993). Having carefully reviewed the record in its entirety, including the objective documentary evidence, we are compelled to conclude that the trial court manifestly erred in rendering judgment in favor of Kimball Properties and against Baker Prinitng.

APPLICABLE LAW
A person is in possession of immovable property when he has corporeal possession thereof, or civil possession thereof preceded by corporeal possession by him or his ancestors in title, and possesses for himself, whether in good faith or bad faith, or even as a usurper. LSA-C.C.P. art. 3660. More specifically, for one to acquire possession, one must intend to possess as owner and must take corporeal possession of the thing. LSA-C.C. art. 3424. If a possessor has a title, he has constructive possession within the limits of his title. This is so even if the title is without warranty.[7] If one does not have a title, his possession must be inch by inch or within enclosures, be they natural or artificial. See LSA-C.C. art. 3426 and comment (d).
Once acquired, possession is maintained by the intent to possess as owner, even if the possessor ceases to possess corporeally. This is known as civil possession.[8] LSA-C.C. art. 3431. Civil possession is presumed to exist until possession is abandoned or the possessor is evicted by another. LSA-C.C. arts. 3432 and 3433. Hence, should an obstacle to the exercise of one's possession arise, that possession may be lost despite any continued existence of the intent to own.
An eviction from possession or usurpation occurs when a person takes corporeal possession of a thing that was in another's possession. A.N. Yiannopoulos, Property § 313, at 619-20, in 2 Louisiana Civil Law Treatise (4th ed. 2001). Ordinarily, the erection of a fence or other enclosure or the use of the property according to its nature by a person claiming it adversely to the possessor is an eviction. LSA-C.C. art. 3433 comment (d). Simply put, either corporeal, civil, or constructive possession is lost as a result of the adverse corporeal possession of the same thing by another. Yiannopoulos, supra, §§ 313, 336, at 620-21, 661.
To be legally effective, one's possession must be open and public. LSC.C. arts. 3435 and 3436. The possessor must act as a person would act who has the right that the possessor claims to exercise. If a possessor seeks to hide his acts of possession from those who would have an interest therein, his possession is clandestine, and thus invalid. See Yiannopoulos, supra § 316, at 626.
The timely institution of a possessory action against one who has disturbed or usurped another's possession prevents the defendant from acquiring the right to possess. See LSA-C.C. art. 3434. To maintain a possessory action, as provided for by LSA-C.C.P. art. 3658, a possessor must allege and prove that:
(1) He had possession of the immovable property or real right therein at the time the disturbance occurred;
(2) He and his ancestors in title had such possession quietly and without interruption for more than a year immediately prior to the disturbance, unless evicted by force or fraud;
(3) The disturbance was one in fact or in law, as defined in Article 3659; and
(4) The possessory action was instituted within a year of the disturbance.
If one's possession has already been usurped at the time of the disturbance, the possessory action fails because it does not meet the requirement of Article 3658(1) of the Code of Civil Procedure. See Yiannopoulos, supra § 336, at 661.

DISCUSSION
With the foregoing precepts in mind, we address first Kimball Properties' possessory claim. As an initial matter, we note that Kimball Properties produced no title to the disputed strip. Such a title is certainly not necessary in a possessory action; however, absent a title, Kimball Properties had the burden of proving actual possession either inch by inch or within enclosures. Kimball Properties presented insufficient evidence of any enclosure at the southern boundary of the disputed strip, the point to which it claims possession. Accordingly, Kimball Properties had to prove its possession of the disputed strip "inch by inch."
According to its written reasons for judgment, the trial court concluded that the fact that H.M., as a child, had walked the property with his father and that long ago they had dragged dead cattle onto the disputed strip constituted Kimball Properties' possession of the disputed strip. Although not specified by the trial court in its written reasons, we note that the testimony also established that H.M. used to drive on the old road when going to his hunting camp. Moreover, two witnesses testified to hunting in the vicinity; however, significantly, they reported that they hunted from deer stands located on Kimball Properties' undisputed tract of property, and they never expressly stated that they went onto the disputed strip.
We conclude that all of these actions, even in their totality, were probably inadequate to constitute corporeal inch by inch possession of the disputed strip. It is well-settled that "occasionally" walking or riding on property is generally insufficient to establish corporeal possession. See Skillman v. Harvey, 2003-2724, p. 7 (La.App. 1 Cir. 12/30/04), 898 So.2d 431, 436, writ denied, XXXX-XXXX, (La. 411105), 897 So.2d 610. Kimball Properties' alleged "occasional" hunting, which was far from established, is likewise considered insufficient. Id. This leaves only Kimball Properties' acts of "occasionally" dragging a dead cow onto the strip. It is arguable whether these acts were sufficient to constitute corporeal possession.
However, assuming arguendo that such acts of cattle dragging did constitute corporeal possession, we note that these acts occurred in excess of 20 years ago.[9] Notwithstanding that the exact inch by inch location of these acts was not definitively established,[10] it is manifest that by the time Baker Printing purchased the property, Kimball Properties was only exercising civil possession over this particular area within the disputed strip. For the reasons explained more fully below, we find that immediately following its purchase, Baker Printing began to exercise adverse corporeal possession of the disputed strip that effectively ousted Kimball Properties' presumed civil possession of any part therein. Accordingly, Kimball Properties could not maintain its possessory action, because it failed to satisfy LSA-C.C.P. art. 3658(1) insofar as it did not have possession at the time of the alleged timber cutting disturbance in August 2003. Therefore, the trial court erred in granting judgment in favor of Kimball Properties on its possessory action.
Consequently, we turn now to address Baker Printing's competing possessory claim. At the outset, we observe that Baker Printing presented evidence indicating that both an artificial and a natural boundary, i.e., the fence/tree line, enclosed the disputed strip that it claimed to possess. Therefore, we may disregard, for the sake of argument, the fact that Baker Printing had constructive possession of the disputed strip by virtue of its title, which was admitted into evidence.
We further note that if the only alleged acts of corporeal possession relied upon by Kimball Properties were the occasional dragging of dead cows onto the disputed strip, and driving on the old road, as well as "possible" occasional hunting, then, a fortiori, Kimball Properties would surely have to concede that Baker Printing's more substantial activities constituted adverse corporeal possession. Notwithstanding any such concession or lack thereof, this court finds that these activities, particularly when taken in their totality, demonstrated Baker Properties' corporeal possession of the enclosed disputed strip.
Within six months of its purchase, Baker Printing had erected fencing at the tree line so as to enclose the disputed strip with its undisputed property and had installed two locked gates on the disputed strip. It also enrolled the disputed strip in DMAP and posted the perimeter of the disputed strip with the required DMAP signs.
In addition to the foregoing external signs of possession, Baker Printing also bulldozed the old road to make it traversable, straightened its path in certain areas, and thereafter used this road to perform routine patrols of the strip, as opposed to mere "occasional" riding. It also began to systematically manage the deer population on the disputed strip by conducting regulated hunting under the auspices of the LDWF's DMAP. Not only did it perform frequent hunting activities, but it also erected at least two or three deer stands on the disputed strip. In the months and years thereafter, Baker Printing paid property taxes on this disputed strip, entered into a timber contract, and began logging operations there.
The courts of the state have repeatedly found corporeal possession to exist under comparable circumstances. See Hill v. Richey, 221 La. 402, 59 So.2d 434 (1952) (evidence of use of adjoining strip of land for grazing and logging purposes established possession of such land: the limits, character, and extent of which were fixed with sufficient certainty by fences, remains of old fences, marks on trees and no trespassing signs to entitle possessor to maintain possessory action to be quieted and maintained in the possession of all such land); Womack v. Walsh, 255 La. 217, 230 So.2d 83 (1969) (existence of fences surrounding disputed tract, plaintiffs' clearing of portion of it, filling in well with bulldozer, and planting and mowing grass on the tract were sufficient to constitute exercise of actual possession to maintain possessory action); Poirrier v. Dale's Dozer Service, Inc., 99-2593 (La.App. 1 Cir. 11/3/00), 770 So.2d 531 (plaintiff had possession of the disputed property for many years within enclosures, as the disputed tract was enclosed by a fence until adjoining road was widened, and plaintiff used the land as a pasture and for growing hay for many years, and allowed the erection of a commercial sign); Harvey v. Harvey, 431 So.2d 786 (La.App. 1 Cir. 1983) (in possessory action, evidence that plaintiffs had, over the years, farmed tracts including disputed area, constructed ponds and levees on the tracts, entered into timber contracts for lumber on the tracts and into mineral leases involving the tracts and paid taxes thereon, was sufficient to establish corporeal possession followed by civil possession of disputed area); Ewald v. Hubbard, 31,506 (La.App. 2 Cir. 3/12/99), 737 So.2d 858, writ denied, 99-1289 (La. 6/25/99), 746 So.2d 602 (adjoining landowner's maintenance of fence and use of disputed land was sufficient to provide notice to the public of extent of his possession); Otwell v. Diversified Timber Services, Inc., 2004-924 (La.App. 3 Cir. 1/26/05), 896 So.2d 222, writ denied, XXXX-XXXX (La. 4/22/05), 899 So.2d 575 (evidence was sufficient to support finding of corporeal possession where landowner's husband testified that he began timber management on land at her request, that he marked many trees on the perimeter, ran off trespassers, cut an existing fence to make a riding trail, hunted, and placed the property in a hunting club that posted signs and erected deer stands); Verzwyvelt v. Armstrong-Ratterree, Inc., 463 So.2d 979 (La.App. 3 Cir. 1985) (landowners corporeally possessed high ground surrounded by lake by raising agricultural crops and grazing cattle upon it, constructing water control structure, and granting permission to individuals to build duck blinds and hunt upon the lake); Allbritton v. Powell, 389 So.2d 846 (La.App. 3 Cir. 1980) (plaintiffs exercise of grazing privileges up to old fence line, which included the strip in question, along with the maintenance of the fence, constituted corporeal possession of the property in question, and therefore, plaintiff was entitled to be recognized as the possessor of the property).
Despite Kimball Properties' argument to the contrary, Baker Printing's corporeal possession of the disputed strip was not clandestine. The record is devoid of any evidence that it sought to hide its many acts of possession. To the contrary, Baker Printing performed extensive bulldozer work, erected deer stands, and installed a locked gate, all within five to forty feet of the fence/tree line, and thus, in close proximity to Kimball Properties' undisputed property. In addition, Baker Printing initiated the obvious and considerable logging operations that prompted the present litigation.
Moreover, Baker Printing re-erected the fence at the disputed strip's northern boundary with Kimball Properties' undisputed property and posted it with DMAP signs. Baker cannot be penalized simply because representatives of Kimball Properties did not go on the disputed strip for several years and thus, did not see the roadwork, deer stands, and locked gates. Nor can Baker Printing be penalized because representatives of Kimball Properties allegedly could not see the fence and the DMAP signs because it had allowed the weeds and/or canes aroeund the perimeter of its undisputed, adjacent property to become overgrown thereby obscuring the area. These clearly cannot be construed as acts perpetrated by Baker Printing to hide its activities. Even so, we note that H.M. testified that he saw the signs at the time of the logging incident, and possibly before then.
In summary, we find that Baker Printing satisfied all of the requirements of LSA-C.C.P. art. 3658. Consequently, we find that the trial court erred in dismissing its possessory action.

DECREE
For all of the foregoing reasons, the judgment of the trial court is reversed. We hereby render judgment in favor of Baker Printing Company, Inc. and against Kimball Properties, L.L.C., maintaining Baker Printing Company, Inc. in its possession of the disputed strip in this matter, which is described as follows:
That certain fractional portion of ground, together with all the buildings and improvements thereon, and all the rights, ways, privileges, servitudes, appurtenances and advantages thereunto belonging or in anywise appertaining, located in Section 32 and/or Section 90,[11] Township 7 South, Range 10 East, West Baton Rouge Parish, Louisiana, and being a strip of land along the northerly boundary of the 873.59 Ac. Tract shown on the map entitled "Map Showing Survey of 873.59 Acres (H.L. Laws & Co., Inc.) for Andy Bishop, et al Sections 4-13 & 90-92 T7S-R10E Iberville & West Baton Rouge Parish, La.," dated December 18, 2000, made by Charles St. Romain, which map is on file and of record, in the offices of the Clerks and Recorders for Iberville and West Baton Rouge Parishes, Louisiana; said strip of land containing 17.68 acres and being more particularly described as follows:
Commence at a marker found at the southeasterly corner of the 873.59 acre tract, thence proceed North 00°44'00" West a distance of 8397.05 feet to the POINT OF BEGINNING; thence proceed South 89°28'59" West at a distance of 6283.50 feet to a point on the westerly boundary of the 873.59 acre tract and corner; thence proceed North 00°41'17" East a distance of 160.09 feet to the northwesterly corner of the 873.59 acre tract and corner; thence proceed along the northerly boundary of the 873.59 acre tract South 89°49'59" East a distance of 5850.44 feet to an iron pipe; thence proceed along the northerly boundary of the 873.59 acre tract South 89°53'20" East a distance of 429.81 feet to the northeasterly corner of the 873.59 acre tract and corner; thence proceed South 00°44'00" East a distance of 85.51 feet to the POINT OF BEGINNING.
All costs of this appeal are assessed to Kimball Properties, L.L.C.
REVERSED AND RENDERED.
NOTES
[1] Despite the admittance of the title into evidence, neither party herein is asserting title ownership of the property via a petitory action. This matter presents only competing possessory claims.
[2] The specified dates do not include any days of hunting on which kills were not made.
[3] It is uncertain whether H.M.'s father purchased the property in a representative capacity for Kimball Properties or on his own behalf and thus, was an ancestor in title to Kimball Properties. For the sake of clarity, we will assume for the purposes of this opinion that the property was purchased by Kimball Properties.
[4] He contended that the pictures admitted into evidence demonstrated a difference in the circumference of the trees, and thus presumably acted as some sort of boundary and/or enclosure. Based on our observation of the photographs, we are unable to say they provide any support for his contention.
[5] In brief to this court, Kimball Properties alleges that it, or IL M., originally constructed this road. However, we are unable to find any evidence presented at trial to substantiate this claim.
[6] Presumably, Mr. Pierce also hunted from the deer stands that were located on Kimball Properties' undisputed tract.
[7] In its written reasons for judgment, the trial court stated that it had given "considerable attention" to the fact that the sale of the disputed strip to Baker Printing was without warranty. However, as noted, good or bad faith and/or a title without warranty are factors that are irrelevant under the circumstances of the instant case, and the trial court's reliance on this particular fact in making its decision was clearly wrong.
[8] Vestiges of works, such as fences, roads, or other constructions may signify civil possession. See LSA-C.C. art. 3431, comment (d).
[9] In addition, we note that H.M.'s walking the property as a child also occurred more than 20 years earlier. At trial, he testified he had not even been in the area of the disputed strip for five to seven years. Moreover, H.M. had ceased hunting before Baker Printing's 2001 property purchase. Since the road was grown over and not traversable, it may be presumed that he had not ridden on the road during the years preceding 2001.
[10] The record only establishes that the dead cattle had been dragged through a gap in the fence.
[11] The trial court judgment noted that Kimball Properties, LLC contended that the disputed strip lies entirely in Section 32, whereas Baker Printing Company, Inc. contended that the disputed strip lies entirely in Section 90, and that "the parties reserve these contentions in the event of any future litigation."